

**ORDERED in the Southern District of Florida on February 24, 2011.**

_____
Paul G. Hyman, Chief Judge
United States Bankruptcy Court

_____

```
             UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
                WEST PALM BEACH DIVISION


In re:                              CASE NO.:07-18229-PGH

JOSEPH W. CRISTINA,                 CHAPTER 7
     Debtor.
_____/

SYMANTEC CORPORATION,               ADV. NO.:08-01004-PGH-A
     Plaintiff,

v.

JOSEPH W. CRISTINA,
     Defendant.
_____/
```

**MEMORANDUM ORDER ON PLAINTIFF'S COMPLAINT TO DETERMINE DEBT NONDISCHARGEABLE PURSUANT TO 11 U.S.C. § 523**

**THIS MATTER** came before the Court for trial on November 22 and 24, 2010, upon Symantec Corporation's ("Symantec" or "Plaintiff") Complaint, which seeks a determination that its claim against the Debtor is nondischargeable pursuant to § 523(a)(2)(A), (a)(4), and

1

(a)(6) of the Bankruptcy Code.  The Court, having considered the testimony, candor and demeanor of the witnesses, the submissions of the parties, the applicable law, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Symantec is a judgment creditor of the Debtor by virtue of a default judgment and award of attorney's fees and costs entered in *Symantec v. Global Impact, Inc., et al.*, Case No. 3:07-cv-00126-DMS-NLS, in the United States District Court for the Southern District of California (the "California Action").  Symantec's Complaint in the California Action included ten counts based upon allegations that the Debtor sold counterfeit copies of Symantec's copyrighted Symantec and Norton computer software[1] through his company, Global Impact, Inc.  The Debtor was the owner, president, and sole person involved with the operations of Global Impact.  In 2005, Symantec used private investigator Jodie Pavey ("Pavey")[2] to conduct a series of "test purchases" of Symantec software CDs from Global Impact to determine the authenticity of the software being sold by the Debtor.  There is no dispute that every one of the 105 Symantec CDs Pavey purchased was inauthentic.  Trial Tr. 244:7-8

---

[1] For ease of reference, this Order refers to all of the software products at issue as "Symantec" products.

[2] Pavey used the alias Sarah Thomas when conducting test purchases, so Sarah Thomas is the name that appears on test purchase invoices.

Nov. 22, 2010 (D.E. 158).

*1.  The 2005 Cease and Desist Emails*

On May 10 and 12, 2005, Chad Sharpe ("Sharpe"), a brand protections operations manager for Symantec, sent the Debtor two separate cease and desist emails.  These emails were identical: both contained the same four sentence statement,[3] Sharpe's name, title, and Symantec's address, and both lacked a Symantec logo or mark; instead, they contained a logo for Lotus Notes, an email program unaffiliated with Symantec.  Pl.'s Ex. 1 and 2.  The Debtor testified that he received at least one of these emails (the "2005 Cease and Desist Email"), that he sent a response email requesting more information on May 31, 2005, and that he never received a reply.  The Debtor testified that he concluded the 2005 Cease and Desist Email was not authentic due to Symantec's failure to respond, and due to the email's brevity and lack of a Symantec logo.

At trial, Symantec disputed whether the Debtor responded to Sharpe's email, pointing out that the Debtor could not produce a

---

[3] The 2005 Cease and Desist Email read:

The Symantec Corporation has received evidence that you have been, or are continuing to be, engaged in the sales of counterfeit Symantec products.  This is a serious violation of Symantec's intellectual property rights.

We request that you cease selling our products and contact me immediately to make arrangements to examine the Symantec products you have in stock and the source of these products.

The failure to respond or the continued sales of counterfeit Symantec products will result in further legal action, as appropriate, to protect Symantec's rights.

copy of the email he allegedly sent to Sharpe.  However, the Debtor did produce a draft of the email he allegedly prepared in a word processing program to check for spelling and grammar errors.  Pl.'s Ex. 3.  Although Symantec challenged the authenticity of this draft on the basis that it contained several writing errors, these were errors that a word processing program would not automatically correct, for example, the use of the words "Never the less" instead of the word "nevertheless."  Regarding his failure to produce the actual email, the Debtor testified that his pre-2006 email was lost when Symantec caused his website to be shut down in July 2006.  Symantec offered no evidence to contradict the Debtor's testimony.  However, Sharpe stated in his deposition testimony that he never received a response from the Debtor.  Nevertheless, based on the evidence introduced at trial, the Court finds the Debtor responded to the 2005 Cease and Desist Email, and that he concluded the email was not authentic due to the lack of any further inquiry by Symantec.

After sending the 2005 Cease and Desist Email, Symantec did not communicate with the Debtor again for over a year.  In that time, the Debtor continued to sell Symantec products.  At least some of these sales were counterfeit, as evidenced by a test purchase of counterfeit Symantec CDs by Pavey on May 24, 2005.  Pl.'s Ex. 21, at 37.

*2.   The 2006 Cease and Desist Emails and Alleged Subsequent Sales*

On June 6, 2006, the Debtor received a three-page cease and desist email from Chansonette Conolly in Symantec's legal department, demanding that the Debtor stop selling Symantec products (the "June 6, 2006 Cease and Desist Email"). Pl.'s Ex. 4. The Debtor testified that he immediately complied with this demand, and sold no further Symantec software after receiving the June 6, 2006 Cease and Desist Email. Symantec challenged this testimony. Both parties rely on invoices the Debtor produced showing his purchases and sales of Symantec products just prior to June 6, 2006. According to these invoices, the Debtor sold 100 Symantec CDs on May 23, 2006, purchased 100 CDs on May 25, 2006, and sold 12 CDs on June 1, 2006. Def.'s Ex. R, at 93; Pl.'s Ex. 20, at 80; Pl.'s Ex. 21, at 1. The parties agree that in June 2006 the Debtor returned his remaining Symantec CDs to Symantec, approximately six CDs. Based on the difference between the May 23 purchase of 100 CDs and the June 1 sale of 12 CDs, and the fact that the Debtor only returned six CDs in June 2006, Symantec asserts that the Debtor must have sold the other CDs sometime after receiving the June 6, 2006 Cease and Desist Email, at a time when the Debtor knew his supply of Symantec software was counterfeit.

However, Symantec failed to introduce any evidence of an actual sale of Symantec CDs by the Debtor after June 6, 2006. Regarding the invoices introduced at trial, the Debtor testified

5

that he forwarded the 100 CDs purchased on May 25, 2006 to a client on that same day, and that this sale is reflected in the May 23 invoice. Although Symantec questioned how CDs purchased on May 25 could be sold on May 23, the Debtor testified that the May 23 and May 25 invoices actually represent one contemporaneous transaction, and that the dates on the invoices are merely dates the Debtor input into his bookkeeping software. This testimony is credible, as both parties agree that the Debtor's recordkeeping was "spotty." Tr. 91:10-16 Nov. 22, 2010. Furthermore, this explanation is consistent with the Debtor's testimony that he only purchased software as needed to fill orders and held no inventory.

Symantec also failed to introduce any evidence that the twelve CDs sold on June 1, 2006 came from the 100 CDs purchased on May 25, 2006. Thus, there is no evidence that the Debtor's purchase of 100 CDs on May 25 and sale of twelve CDs on June 1 would result in the Debtor's having 88 CDs left in his possession. Regarding the approximately six CDs the Debtor returned to Symantec, the Debtor testified that he occasionally had surplus CDs when a customer cancelled an order, and that the CDs returned to Symantec were the result of such a surplus. Finally, evidence that the Debtor's website listed Symantec software as available for sale after June 6, 2006, does not prove that the Debtor actually made a sale of Symantec software after June 6, 2006, or that the Debtor would have consummated such a sale given the opportunity. In light of this

evidence introduced at trial, the Court finds that the Debtor ceased selling Symantec product upon receiving the 2006 Cease and Desist Email.

*3. Symantec's Evidence Regarding the Debtor's Intent*

By its remaining evidence, Symantec attempts to show that regardless of the 2005 and 2006 Cease and Desist Emails, the Debtor knew he was selling counterfeit Symantec software either because he knew his suppliers were selling him counterfeit software, or because of his direct familiarity with the CDs he sold. However, none of Symantec's evidence on this issue was persuasive.

Regarding his suppliers, Symantec points out that the Debtor represented to Symantec that he purchased software from certain well-established software vendors, even though the Debtor did not actually purchase Symantec software from any of those vendors in the period from 2004 to 2006. However, the Court finds that the Debtor's exaggeration about which suppliers he used, or about his actual suppliers' status in the software industry, amounts to puffery rather than gross misrepresentation. There is no evidence the Debtor's statements were intended to hide dishonest practices by his actual suppliers, or that the Debtor was aware of such practices. Regarding Symantec's evidence that the Debtor did not know detailed information about his suppliers, such as contacts' last names, Symantec presented no evidence that this lack of information is unusual in the industry. More importantly, the fact

7

that the Debtor lacked detailed knowledge of his suppliers is not evidence that he purposefully bought from those suppliers to acquire counterfeit software.  Symantec also questioned the Debtor's decision to purchase from suppliers that were not authorized Symantec vendors.  However, Sharpe stated in his deposition testimony that because of the chain of commerce, authentic Symantec software can legitimately be purchased from both authorized and unauthorized vendors.  Trial Tr. 354:15-19 Nov. 24, 2010 (D.E. 159).  Thus, the fact that the Debtor only purchased Symantec software from unauthorized vendors is not evidence that the Debtor intended to purchase counterfeit software.  Finally, Symantec introduced evidence that in May 2005, the Debtor returned a purchase to a supplier, Global Trading International, Inc. ("Global Trading") with a note that "email for publisher states that some of the product might not be authentic," a reference to the 2005 Cease and Desist Email.  Pl.'s Ex. 20, at 19.  Symantec also introduced evidence that the Debtor thereafter continued to purchase software from Global Trading.  However, the Debtor testified that the return of the CDs to Global Trading was a precautionary measure taken after the Debtor received the 2005 Cease and Desist Email, and that he resumed purchasing from Global Trading after concluding that the 2005 Cease and Desist Email was not authentic.  Tr. 138:14-23 Nov. 22, 2010.  Thus, the return in May 2005 does not prove that the Debtor knew Global Trading was

8

selling counterfeit software, and the Debtor's subsequent purchases from Global Trading are not evidence the Debtor intended to acquire counterfeit software.

With respect to whether the Debtor knew he was selling counterfeit CDs, Symantec presented evidence that the Debtor received orders before forwarding them to customers, and that the Debtor could have inspected the CDs at that time.  However, the Debtor testified that when he received such shipments, he removed his suppliers' shipping label from the box and replaced it with his own, forwarding the shipment to his customers without inspecting the contents.  Again, this testimony is consistent with the Debtor's testimony that he ordered software as needed and forwarded it directly to his customers.  Symantec also introduced deposition testimony in which Pavey states that the Debtor told her that he received customer complaints about bad key codes for Symantec software.  However, the Debtor flatly denied having received any such complaints.  Finally, Sharpe stated in his deposition testimony that the Debtor sold Pavey Symantec software at unusually low prices.  However, Sharpe also acknowledged that the Debtor's prices were only low by retail standards, and that Pavey was not buying as a retail customer.  Tr. 392:7-19 Nov. 24, 2010. Considering this evidence together, the Court finds that Symantec failed to prove that the Debtor intentionally purchased counterfeit Symantec software, or that the Debtor knew, based on his knowledge

of his CDs, the CDs' prices, or customer complaints, that he was selling counterfeit software.

## CONCLUSIONS OF LAW

**I.  Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

**II. Section 523(a)(6)**

When considering a complaint under § 523(a)(6), the Court must "construe strictly exceptions to discharge in order to give effect to the fresh start policy of the Bankruptcy Code."  *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148, 1152 (11th Cir. 2001) (*citing In re Walker*, 48 F.3d 1161, 1164-65 (11th Cir. 1995)); *see also In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994) ("evidence presented must be viewed consistent with congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor" (*quoting Caspers v. Van Horne*, 823 F.2d 1285, 1287 (8th Cir. 1987)).  The burden of proof is a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

An injury alleged to form the basis for a nondischargeable claim under § 523(a)(6) must be both willful and malicious.  *Drewes v. Levin (In re Levin)*, 434 B.R. 910, 917 (Bankr. S.D. Fla. 2010).  Regarding willfulness, the Supreme Court has held that injuries

resulting from recklessness are not sufficient to be considered willful injuries under § 523(a)(6).  *Id.* (*citing Kawaauhau v. Geiger*, 523 U.S. 57, 60-61 (1998)).  Instead, a plaintiff must show either that the Debtor had the subjective intent to inflict the injury, or that the Debtor was aware that the injury was substantially certain to result from his conduct.  *DirecTV v. Deerey (In re Deerey)*, 371 B.R. 525, 533 (Bankr. M.D. Fla. 2007) (*citing Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002)).

When the injury alleged is copyright infringement, a plaintiff must show that the debtor intentionally infringed the plaintiff's copyright.  *Star's Edge, Inc. v. Braun (In re Braun)*, 327 B.R. 447, 450-51 (Bankr. N.D. Cal. 2005).  Focusing on the debtor's intent to perform an act - the infringement - is appropriate in this context because unlike other contexts in which a debtor's intentional act may or may not cause injury, intentional copyright infringement does not have "uncertain or variable outcomes."  *Id.*  In other words, intentional infringement of a copyright or trademark is "tantamount to intentional injury under bankruptcy law" because "it is impossible to separate the 'conduct' of trademark infringement from the 'injury' of trademark infringement when considering the defendant's intent." *Smith v. Entrepreneur Media, Inc.*, 2009 WL 6058677, at *9-10 (9th Cir. B.A.P. 2009).  Furthermore, a debtor who intentionally infringes a copyright "is charged with the

11

knowledge of the natural consequences of his actions[,]" such as the harm that will result from the infringement. *Deerey*, 371 B.R. at 534 (*citing In re Cohen*, 121 B.R. 267 (Bankr. E.D.N.Y. 1990)). Thus, a debtor who intentionally infringes a copyright is charged with the knowledge that injury to the copyright holder is sure, or substantially certain, to result.

In this case, Symantec asserts that the Debtor intended to sell counterfeit Symantec software, thereby intentionally infringing Symantec's copyright. Symantec asserts that the Debtor knew he was selling counterfeit software, as evidenced by facts such as the Debtor's choice of vendors, his prices, and other evidence set forth in the Court's Findings of Fact. Even if the Debtor did not know all along that he was selling counterfeit software, Symantec asserts that the 2005 and 2006 Cease and Desist Emails put the Debtor on notice that his software was counterfeit, and that he intentionally sold counterfeit software after receiving those emails.

As explained above, however, the Court finds that Symantec's evidence fails to prove that the Debtor knew he was selling counterfeit Symantec software. Moreover, the Court finds that the Debtor's decision to continue selling Symantec products after receiving the 2005 Cease and Desist Email arose from the Debtor's determination that the email was inauthentic, rather than from a decision to intentionally sell counterfeit software. The Court

12

finds the Debtor's determination in this regard to have been reasonable in light of Symantec's failure to reply to the Debtor's response, and particularly in light of Symantec's failure to inquire further into the Debtor's activity until over a year later. Although Symantec cites cases for the proposition that a debtor's continued infringement after receiving a cease and desist notice is sufficient to establish willfulness, those cases are factually distinguishable because they involve debtors who simply ignored cease and desist notices even when the notice's authenticity was beyond question. *See, e.g., In re Gabaldon*, 55 B.R. 431, 432 (Bankr. N.M. 1985) (debtor continued infringement was intentional when creditor sent three separate letters explaining copyright laws and advising the debtor of the need for a license); *Symantec v. Mann (In re Mann)*, 410 B.R. 50, 51 (Bankr. C.D. Cal. 2009) (debtor admitted that he continued to sell counterfeit software even after being informed in person by a Symantec employee that he was selling counterfeit software). The critical fact in these cases was that the debtor must have known their continued conduct would constitute copyright infringement, such that continuing amounted to intentional infringement. In this case, the 2005 Cease and Desist Email fails to establish that fact. The Court also finds that the Debtor immediately stopped selling Symantec software upon receiving the June 6, 2006 Cease and Desist Email. As such, Symantec failed to meet its burden of proving that the Debtor intentionally

13

infringed Symantec's copyright.  At worst, the Debtor acted recklessly by selling Symantec software without taking further steps to ensure its authenticity, or by continuing to sell Symantec products after receiving the 2005 Cease and Desist Email.  However, the Court finds that this conduct does not amount to willful injury by the Debtor.  Because the Debtor did not willfully injure Symantec, the Court will enter judgment in favor of the Debtor with respect to § 523(a)(6).

### III. Section 523(a)(2)(A) and (a)(4)

Symantec failed to present evidence relevant to § 523(a)(2)(A) or (a)(4) during trial, or address these sections in its written post-trial brief.  Therefore, the Court will also enter judgment in favor of the Debtor with respect to § 523(a)(2)(A) and (a)(4).

### CONCLUSION

Symantec bears the burden of proving by a preponderance of the evidence that its default judgment from the California Action should be excepted from discharge under § 523(a)(2)(A), (a)(4), and (a)(6).  With respect to § 523(a)(6), the Court, bearing in mind its obligation to construe exceptions to discharge narrowly against creditors and liberally in favor of debtors, finds that Symantec failed to carry its burden of showing that the Debtor intentionally sold counterfeit Symantec software.  Therefore, Symantec's default judgment is not a debt for willful and malicious injury by the Debtor to Symantec.  Because Symantec failed to present any

evidence or argument relevant to § 523(a)(2)(A) or (a)(4), the Court also finds that Symantec failed to meet its burden of proof with respect to these sections.

### ORDER

The Court, having heard the testimony of witnesses, having considered the evidence presented at trial, the arguments of counsel, the applicable law, and being otherwise fully advised in the premises, hereby

**ORDERS AND ADJUDGES** that:

1. Judgment is awarded in favor of the Debtor.
2. The debt arising from the California Action which is owed by the Debtor to Symantec is **DISCHARGED.**
3. Pursuant to Federal Rule of Bankruptcy Procedure 9021, a separate final judgment shall be entered contemporaneously herewith.

###

Copies furnished to:

Lorne Adam Kaiser, Debtor's Counsel

Elizabeth M. Bohn,
Henry H. Gonzalez, and
Mark D. Baute, Symantec's Counsel